UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LONNA SOWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  4:08CV633 TIA |
| | ) | |
| GATEHOUSE MEDIA MISSOURI | ) | |
| HOLDINGS, INC., GATEHOUSE MEDIA, | ) | |
| INC., GATEHOUSE MEDIA MISSOURI | ) | |
| HOLDINGS II, INC., and | ) | |
| ROLLA DAILY NEWS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Partial Summary Judgment.
(Docket No. 24).  Plaintiff filed a Memorandum in Opposition (Docket No. 29) and Defendants filed
a Reply (Docket No. 31) thereto.  After being granted leave by the undersigned, Plaintiff filed a Sur-
Reply (Docket No. 35) and, in response, Defendants filed a Motion to Disregard/Strike All Portions
of Plaintiff's Sur-Reply Addressing Matters Beyond the Affidavit of Susan Labantschnig or Any
Other Material Deemed "New," or, in the Alternative, for Leave to File Sur-Sur-Reply to All
Remaining Matters (Docket No. 36) and Plaintiff filed Opposition (Docket No.38) thereto.  All
matters are pending before the undersigned United States Magistrate Judge, with the consent of the
parties, pursuant to 28 U.S.C. § 636(c).

Plaintiff Lonna Sowers filed the instant action against Defendant regarding her alleged
discriminatory termination on the basis of her age.  (Plaintiff's Complaint, Docket No. 1).  Plaintiff
seeks monetary damages, including lost wages, lost benefits, emotional damages, liquidated damages,

punitive damages, and litigations costs, from Defendant for her unlawful termination based on age in violation of the Age Discrimination in Employment Act of 1967 (Count I) and the Missouri Human Rights Act (Count II).  Plaintiff further alleges that Defendants violated the Missouri service letter statute (Count III).  Mo. Rev. Stat. § 290.140.

Defendants have filed a motion for partial summary judgment claiming that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law with respect to Counts I and II and partial judgment with respect to Count III.  Plaintiff has responded to Defendants' motion to which Defendants have replied.

Pursuant to Rule 56(c), Federal Rules of Civil Procedure, a court may grant summary judgment if the information before the court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The burden of proof is on the moving party to set forth the basis of the motion, Celotex Corp. v. Citrate, 477 U.S. 317, 323 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).  Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial.  Id.  The non-moving party may not rest upon her pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion.  Celotex, 477 U.S. at 324.

Summary judgment is a harsh remedy and should not be granted unless the movant "has established [its] right to judgment with such clarity as to leave no room for controversy."  New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977).  The Eighth Circuit has noted, however, that "summary judgment can be a tool of great utility in removing factually insubstantial

cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir. 1988).

In passing on a motion for summary judgment, the Court must review the facts in a light most favorable to the party opposing the motion, and give that party the benefit of any inference that logically can be drawn from those facts. Buller v.Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The Court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). At the summary judgment stage, the undersigned will not weigh the evidence and decide the truth of the matter, but rather the undersigned need only determine if there is a genuine issue for trial. Anderson, 477 U.S. at 249. Finally, in making this determination, the Court must be mindful of the Eighth Circuit's admonition that "summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based. Summary judgment is not appropriated unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." Hindman v. Transkrit Corp., 145 F.3d 986, 990 (8th Cir. 1998) (citations omitted); Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir. 2000). Nonetheless, it is clear to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. Putnam v. Unity Health Sys., Inc. 348 F.3d 732, 733-34 (8th Cir. 2003).

The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." Kampouris v. St. Louis Symphony Soc., 210 F.3d 845, 847 (8th Cir. 2000). Instead, the Court "perform[s] only a gatekeeper function of

determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." Id. With these principles in mind, the Court turns to an examination of the facts.[1]

Before addressing the merits of the motion for summary judgment, the undersigned will rule on Defendant's Motion to Disregard/Strike all Portions of Plaintiff's Sur-Reply Addressing Matters Beyond the Affidavit of Susan Labantschnig or any Other Material Deemed "New," or, in the Alternative, for Leave to File Sur-Sur-Reply to all Remaining Matters (Docket No. 36). On a motion for summary judgment, when a moving party advances new evidence and reasons in support of its motion for summary judgment in its reply, the court should either grant the nonmoving party an opportunity to respond or not consider or rely on any new evidence, materials or arguments propounded by the moving party. Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1164-65 (10th Cir. 1998) ("Thus, when a moving party advances in a reply new reasons and evidence in support of its motion for summary judgment, the nonmoving party should be granted an opportunity to respond. However, if the district court grants summary judgment for the movant without relying on the new materials and arguments in the movant's reply brief, it does not abuse its discretion by precluding a surreply."); see also Black v. TIC Inv. Corp., 900 F.2d 112, 116 (7th Cir. 1990) ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond.").

In the Reply Memorandum, Defendants have offered "new" evidence, an affidavit of Susan Labantschnig, to refute Plaintiff's argument asserted in her Memorandum in Opposition. After

---

[1]The undersigned is finding these facts for purposes of this motion only, and this Memorandum and Order cannot be used for any purpose at trial and does not relieve any party from proving all facts necessary to sustain any claims and/or defenses at trial.

reviewing the pleadings and considering the argument of counsel, the Court will disregard any argument unrelated to either the Labantschnig affidavit or any other materials deemed "new" contained in Plaintiff's Sur-Reply. Accordingly, the undersigned will grant Defendant's Motion to Disregard/Strike all Portions of Plaintiff's Sur-Reply Addressing Matters Beyond the Affidavit of Susan Labantschnig or any Other Material Deemed "New," or, in the Alternative, for Leave to File Sur-Sur-Reply to all Remaining Matters (Docket No. 36).

## The Undisputed Evidence before the Court on the Motion

Viewing all facts and drawing all reasonable inferences in the light most favorable of the nonmoving party, plaintiff, A. Brod, Inc. v. SK & I Co., L.L.C., 998 F. Supp. 314, 320 (S.D.N.Y. 1998), the Court sets forth the following facts as established by the depositions, affidavits, and the records submitted by the parties:

Defendant GateHouse Media Missouri Holdings, Inc. owns several newspapers throughout Missouri including the Rolla Daily News. (Pltf.'s Depo. at 8-9).

Plaintiff jointly filed a charge of age discrimination against GateHouse Media, Inc. at the Equal Employment Opportunity Commission and the Missouri Commission alleging discrimination by Defendant GateHouse Media, Inc. based on her age. Both agencies issued right to-sue- notices and thereafter Plaintiff timely filed the instant Complaint. (Compl. Exhs.). Despite bringing her charge against only Defendant GateHouse Media, Inc., Plaintiff named GateHouse Media, Inc., GateHouse Media Missouri Holdings, Inc., GateHouse Media Missouri Holdings II, Inc., and the Rolla Daily News as Defendants in the instant cause of action. (Compl. at ¶¶ at 3-13).[2]

---

[2]Defendants' contention that Plaintiff's failure to name all Defendants in her charge of discrimination precludes naming that party as a defendant in the subsequent civil action is without merit. Sedlacek v. Hach, 752 F.3d 333, 336 (8th Cir. 1985) (the general rule requires a

Plaintiff lists only GateHouse Media Missouri Holdings, Inc. as her employer in the 2007 W-2 statement. (Pltf.'s Depo. at 7-8 and Depo. Exh. 1). The Rolla Daily News is an asset of GateHouse Media Missouri Holdings, Inc., not a corporation. (Exh. H at 47-48). GateHouse Media, Inc. is a publicly traded company which owns 100% of the stock of its subsidiary, GateHouse Media Intermediate Holdco, Inc.; GateHouse Media Intermediate Holdco, Inc. owns 100% of the stock of its subsidiary, GateHouse Media Holdco, Inc.; GateHouse Media Holdco, Inc. owns 100% of the stock of its subsidiary, GateHouse Media Operating, Inc.; GateHouse Media Operating, Inc. owns 100% of the stock of several subsidiaries including Defendant GateHouse Media Missouri Holdings, Inc. and GateHouse Media Missouri Holdings II, Inc. (Id. at 48).

In her affidavit, Polly Sack, the Senior Vice President, Secretary and General Counsel of GateHouse Media, Inc., averred as follows:

> The various GateHouse corporate entities strictly maintain their specific corporate identities and are not at all lax with following corporate formalities. GateHouse Media, Inc. employs only corporate support employees. Unlike GateHouse Media Missouri Holdings, Inc. and GateHouse Media Missouri Holdings II, Inc., GateHouse Media, Inc. maintains no newspaper employees or operations. And, any corporate support services provided by GateHouse Media, Inc. to its subsidiaries are charged to the subsidiaries.

> Each specific subsidiary corporation manages itself through local management and human resources functions provided at the newspaper or regional/group level. Similarly as Mike Reed testified at his deposition, all personnel decision[sic] are made at the local level. And, all labor relations are similarly managed by local human resources managers and/or Publishers along with local counsel.

---

complainant to file a charge against a party with the EEOC before he can sue that party under Title VII except when there is a substantial identity between the party named in the charge of discrimination and the party named in the complaint). Plaintiff alleges that Defendants share a substantial identity with each other such that all Defendants would have notice of the EEOC charge prior to the filing of this lawsuit. Based on the record, the Court is satisfied that Defendants were provided the requisite notice and opportunity to be heard necessary to excuse Plaintiff's noncompliance with § 2000(e)(1) in this case.

(Deft.s' Mot. Summ. Judg., Exh. I: Sack Aff. at ¶¶ 2-3). Stephen Sowers ("Sowers"), the former publisher of the Rolla Daily News and Plaintiff's husband, averred that he "often received e-mails and correspondence from GateHouse Media Inc., pertaining to such issues as the budget, revenue trends, employee benefits, etc." (Pltf.'s Resp., Exh. 2: Sowers Aff. at ¶ 3). Defendant GateHouse Media, Inc. approved the budget each year created by Sowers for the operations of the Rolla Daily News. (Pltf.'s Exh. 2).

In Counts I and II of the Complaint filed on May 6, 2008, Plaintiff alleges that Defendants GateHouse Media, GateHouse[*sic*] Missouri I, and Gatehouse[*sic*] Missouri II discriminated against her because of her age in violation of the Age Discrimination Act and the Missouri Human Rights Act. (Compl. at ¶¶ 3-10).

Sowers' family founded the Rolla Daily News in 1942. (Pltf.'s Depo. at 13). After his father passed away, the Sowers family sold the Rolla Daily News to American Publishing Company but Sowers remained as the publisher and continued to work in that capacity after American Publishing Company sold the paper to Liberty Group Publishing, Inc. and then Liberty Group Publishing , Inc. sold the paper to GateHouse in 2005. (Id. at 12-15). Plaintiff started dating Sowers in 1985, and they married in 2005. (Id. at 15-16).

At the time of her termination on May 10, 2007, Plaintiff worked as the Advertising Director of the Rolla Daily News, reported to Sowers as her direct supervisor, and was sixty-one years old. (Pltf.'s Aff. at ¶ 8;Pltf.'s Exh. 3: Pltf.'s Depo. at 36). Plaintiff worked in that capacity from 1989 until her termination. (Pltf.'s Resp.: Pltf.'s Aff. at ¶ 8). Jules Molenda, the group publisher over a group of three GateHouse Media Missouri Holdings, Inc. newspapers, including the Rolla Daily News**,** informed Plaintiff of her termination. (Pltf.'s Depo. at 117, 121; Molenda Depo. at 71).

Molenda indicated that the paper was headed in a different direction and noted that her sales numbers, the lower advertising revenues, played a role in the decision to terminate Plaintiff, but he did not discuss Plaintiff's problems with the advertisers or her coworkers. (Molenda Depo. at 72). Molenda is fourteen months younger than Plaintiff. (Pltf.'s Depo. at 36; Molenda Depo. at 5). Randy Cope ("Cope"), a regional manager, co-president and co-chief operating officer of GateHouse Media, Inc. and Molenda's supervisor, was forty-six at the time of her termination. (Pltf.'s Depo. at 36; Cope Depo. at 4,6). Cope could make the decision to hire and fire employees of the Rolla Daily News independently without receiving authorization from a higher up. (Cope. Depo. at 16). Cope's duties included overseeing many of the Missouri publications, including the Rolla Daily News. (Id. at 11). Since December 1998, Cope had been responsible for overseeing the paper, first for Liberty Group Missouri Holdings, Inc. and then for GateHouse Media. (Id.). Cope's supervisor, Mike Reed, was almost forty-one at the time of Plaintiff's termination. (Reed Depo. at 4).

As Advertising Director, Plaintiff's responsibilities included hiring and training a sales team, designing and launching various products, developing relationships with clients, providing ongoing staff training, maintaining relationships and communication with other departments, maintaining and increasing the advertising revenues for the newspapers, and managing the advertising expenses of the newspaper to some degree. (Pltf.'s Depo. at 27-28). In addition, Plaintiff was responsible for overseeing the St. James Leader. (Pltf.'s Depo. at 106). Each fall, Plaintiff would provide the publisher, Sowers, her recommendations regarding the budget for the upcoming year for the Rolla Daily News with respect to the advertising department and then her recommendations would be forwarded to the regional manager for review and possible revisions. (Pltf.'s Depo. at 44-45). The budget established target goals for the upcoming year for revenues and expenses. (Id.; Molenda

Depo. at 35).

As Advertising Director, Plaintiff supervised Jennifer Heflin, Marcia Burns, and Alissa Martin, all advertising sales representatives, as well as Lisa Happel, Cathy Cruise, Jason Light, and David West. (Pltf.'s Aff. at ¶ 9; Pltf.'s Depo. at 10-11). The only employee Plaintiff supervised who was over forty-years old was Marcia Burns. (Pltf.'s Depo. at 33-34).

On a number of occasions, Plaintiff had to speak to Martin about her relationships with coworkers and with advertisers after certain advertisers requested Martin be removed from their accounts. (Pltf.'s Aff. at ¶¶ 11-12). In particular, Plaintiff testified that Martin spread rumors and gossip about coworkers thereby causing problems in the workplace between Martin and her coworkers. (Id. at ¶ 11). As Martin's supervisor, Plaintiff consoled her on several occasions regarding Martin's relationships with advertisers after the advertisers requested that Martin be removed from their accounts. (Id. at ¶ 12). Plaintiff opined that in comparing Martin's sales figures for January 2007 to January 2006, Martin had experienced a greater loss in sales than any other advertising sales representative at the Rolla Daily News. (Id. at 13).

In calendar year 2006, the Rolla Daily News' advertising revenues did not meet the targeted budget for revenues. (Pltf.'s Depo. at 54). For that year, the advertising expenses were significantly more than the budgeted amount, and with negative revenues, the paper suffered negative growth. (Id. at 56). Plaintiff accepted responsibility for the lack of growth in 2006 and acknowledged her responsibility to both Sowers and Cope. (Id. at 57). Advertising revenues further diminished in the first quarter 2007, to a negative growth in revenue by 9% in comparison to the first quarter revenues in 2006. (Id. at 59). Even though prior to 2006 the Rolla Daily News showed revenue growth, Cope testified that he felt the paper was an underperforming publication since 2000. (Cope Depo.

at 21, 53).

Becky Hendrix ("Hendrix") testified that Martin complained to her about Plaintiff and would take issue with occurrences in sales department. (Hendrix Depo. at 14). Hendrix testified that although she did not always agree with Plaintiff's strategies, she did not have any problems working with Plaintiff except when the monthly numbers came out. (Id. at 19-20). Likewise, Joel Goodridge ("Goodridge") testified that in his experience working with Plaintiff, he was not aware of any issues Plaintiff had with her coworkers. (Goodridge Depo. at 16-17). Although he did not have any personality conflicts with Plaintiff, Goodridge indicated that they had some mild disagreements on advertising approaches when packaging their products in sales. (Id. at 17). Cope testified that he had concerns regarding the lack of revenue growth in the market and had heard complaints from various employees concerning difficulty working with Plaintiff. (Cope Depo. at 20-21).

Martin started working at the Rolla Daily News in 1997 as an advertising representative. (Martin Depo. at 8). Sowers hired her and Plaintiff was her immediate supervisor during the time period she worked as a sales representative. (Id.). Her job duties in the sales representative position included maintaining accounts, growing revenue, developing new business, and taking care and maintaining customers. (Id.). Martin submitted a letter of resignation dated September 15, 2000, stating that her last day of employment would be on September 29, 2000. (Martin Depo. Exh. 2). Martin testified that she wanted to resign, because she did not agree with Plaintiff's management style and Plaintiff's failure to perform her job duties. (Martin Depo. at 61-62). Nonetheless, Martin decided not to resign after receiving Sowers' letter outlining several reasons why he thought Martin should stay. (Id. at 62-63). In his letter, Sowers offered to allow Martin to change her schedule by decreasing her hours if so desired and noted how Martin would lose her tenure if she left. (Id. at 63;

Martin Depo. Exh. 3).  Although Martin testified that she discussed with Sowers her reasons for wanting to resign ,including work issues with Plaintiff, in his letter, Sowers never addressed resolving any of Martin's work-related problems including her problems with Plaintiff.  (Martin Depo. at 62). Martin testified that she thereafter discussed Plaintiff's lack of performance issues with Sowers prior to Plaintiff's termination.  (Id. at 30).  In particular, Martin cited Plaintiff's lack of management, erratic work schedule, and failure to plan promotions and calendar of promotions.  (Id. at 30-31). In response, Sowers encouraged Martin with her job performance.  (Id. at 32).

In February 2007, Cope asked Molenda, at that time a publisher of another GateHouse Media Missouri Holdings, Inc. publication, to take on additional duties of a District Manager or Group Publisher, with the primary duty of analyzing the performance of three publications, the Rolla Daily News, the Waynesville daily, and the St. James weekly publications.  (Cope Depo. at 35-36; Molenda Depo. at 35).  Molenda met with Sowers and other department heads, including Plaintiff on two occasions, during his two to three visits to Rolla each week.  (Molenda Depo. at 47).  Plaintiff testified that Molenda spent most of his time during his visits in the publisher's office or shadowing the sales reps, but he  never discussed with Plaintiff her position or the corporate contacts.  (Pltf.'s Depo. at 166-67).  Molenda became Plaintiff's direct supervisor when Cope terminated Sowers in April 2007.  (Cope Depo. at 16).  In March and April 2007, Molenda met with the department heads to determine how they were accepting the publisher turnover and to determine how well their departments were operating.  (Molenda Depo. at 52).  Molenda also met with sales representatives and joined them on sales calls to get to know the Rolla area advertisers and meet the key advertisers. (Pltf.'s Depo. at 107-08; Molenda Depo. at 52).  During such visits with the advertisers, Molenda asked how they felt the newspaper was fulfilling their advertising needs, and if they liked how the

newspaper read. (Molenda Depo. at 54). Molenda testified that three advertisers, two car dealerships, Al West Motors and Denny's Ford, and Creech Furniture Galleries, volunteered negative feedback about Plaintiff and one advertiser at Al West Motors stated that he would not advertise with the paper so long as Plaintiff continued to work at the paper. (Molenda Depo. at 54-56; Cope Depo. at 38). Cope testified that Molenda had reported to him that one of the key advertisers, a car dealer, would not advertise again so long as Plaintiff worked at the paper. (Cope Depo. at 34). The advertising records for the Rolla Daily News for 2006-2007 show that all three advertisers placed advertisements with the paper during that time period. (Pltf.'s Exh. 15). Plaintiff testified that Molenda joined her on one sales call, the Tuesday before she was terminated on Thursday. (Pltf.'s Depo. at 108, 168).

Sowers, Plaintiff's direct supervisor until April 2007, opined that Plaintiff's performance in her job was not lacking, she is well respected by the advertising public, and she is well respected by her former coworkers. ((Sowers' Aff. at ¶¶ 4-7). Sowers further opined that he was not aware of any significant antipathy towards Plaintiff by the advertising public or her former coworkers. (Id. at ¶ 8). Sowers opined that Plaintiff's sales revenues in the first quarter of 2007 were not unacceptable in light of the economic and industry conditions, including the weakening economy, existing at that time. (Id. at ¶¶ 9, 11).

Susan LaBantschnig, a regional accounting manager for GateHouse, explained that the Rolla Daily News has approximately 1,000 active advertisers each year and only 7% of the advertisers spend more than $4,000 in advertising in any year. (LaBantschnig Aff. at ¶¶ 1-3). All three advertisers who complained to Molenda about Plaintiff were among the top 7%, and the two car dealers, Al West Motors and Denny Ford, were the 16th and 14th biggest advertisers in 2006 and

were traditionally in the top 25 advertisers annually. (Id. at ¶ 4). LaBantschnig opined that the monthly gain-loss reports Plaintiff referenced only compares a single month in one year to a single month in the previous year; consequently, if an advertiser opted to place advertising in a different month from the previous year, the report would show a loss in advertising revenues from the associated month in the previous year. (Id. at ¶ 5). LaBantschnig further opined that outside factors such as the economy, loss of sales, or other external factors causing a key advertiser to alter the monthly advertising budget, would cause an extremely negative impact on monthly figures. (Id. at 6).

Molenda consulted with Cope before deciding to terminate Plaintiff. (Molenda Depo. at 61). Molenda testified that in late April 2007, he prepared two memos, one recommending restructuring the three newspapers, the Rolla Daily News, the St. James weekly, and the Waynesville daily, into one regional group with a single Regional Publisher and Regional Advertising Director. (Id.). In the other memo, Molenda testified he explained the reasoning behind his restructuring recommendation, outlined the methodology he utilized such as talking to advertisers and shadowing sales representatives, and opined that Plaintiff should not be named the Regional Advertising Director. (Id. at 62, 68). Molenda concluded the memo by recommending in light of both her interpersonal relationship issues, and the declining advertising revenues for which she was responsible, the paper and the region would be better off without Plaintiff in the newly structured regional position. (Id. at 72). Molenda testified that Plaintiff's sales numbers, lower advertising revenues from January through April 2007, played a role in Molenda's decision to recommend Plaintiff's termination. (Id. at 72-73). Nonetheless, Molenda testified that he informed Cope that if he did not want to terminate Plaintiff, Molenda would assist in rebuilding the bridges Plaintiff burned with the advertisers and the

employees and in improving the financial performance of the paper. (Molenda Depo. at 62; Cope Depo. at 36-37). Cope testified that Plaintiff had never been cited or disciplined for her alleged interpersonal relationship issues with coworkers and advertisers because of her relationship to Sowers. (Cope Depo. at 37). Cope testified that Molenda's conclusions were consistent with his prior information about Plaintiff, but he had not shared such information when he asked Molenda to analyze the performance of the Rolla Daily News and the other newspapers. (Cope Depo. at 41). Molenda testified that his recommendations regarding the restructuring and Plaintiff's termination were sent by Cope to Reed who agreed to the course of action. (Molenda Depo. at 68-69). Based on Molenda's findings and recommendation and the findings mirroring what he had heard for the last two years, Cope agreed that restructuring the papers and terminating Plaintiff to be proper. (Id. at 36-41). On May 10, 2007, Molenda notified Plaintiff of her termination. (Molenda Depo. at 71).

On May 10, 2007, Molenda apprised Martin of some staffing changes, including Plaintiff's termination one hour before Molenda met with Plaintiff, and asked if she would serve as interim advertising director. (Martin Depo. at 25, 29; Molenda Depo. at 91). Martin was not involved in or privy to the decision to terminate Plaintiff. (Martin Depo. at 25, 29). In the interim period, Molenda decided to make Martin, a thirty-three year old female and one of the paper's advertising representatives, the interim Regional Advertising Director. (Molenda Depo. at 90; Martin Depo. at 6). Martin discussed with Goodridge and Molenda the possibility that she might serve as the District Director of Advertising. (Martin Depo. at 26). Martin interviewed for the position with Molenda at the end of June or early July. (Id. at 27). Karen Hood, a female in her forties and the advertising director at the Waynesville Daily Guide, was another internal candidate considered for the position.

(Id. at 28; Molenda Depo. at 65). In July 2007, Cope and Molenda promoted Goodridge, a fifty-year old male and the publisher of St. James and Waynesville, to Regional Publisher of the Rolla Daily News, St. James, and Waynesville. (Goodridge Depo. at 4,9-10). Around August 1, 2007, Martin became the District Director of Advertising. (Martin Depo. at 26).

Plaintiff did not utilize the reporting provisions of the anti-discrimination policies of Defendants or otherwise report or complain to anybody regarding her allegations that she is victim of age discrimination inasmuch as she was no longer an employee following her termination. (Pltf.'s Depo. at 122-23; Exh. 12). Plaintiff testified that she believes Defendants terminated her because of her age. (Pltf.'s Depo. at 150). Plaintiff based this belief on the fact that some advertisers would not work with Martin and Martin had problems with coworkers and her poor sales figures. (Pltf.'s Depo at 74-82). Molenda testified that Plaintiff's age played no role in his decision to recommend her termination. (Molenda Depo. at 100).

Plaintiff testified that she never had any animosity with or towards Cope or Molenda and never exchanged any harsh words with either one. (Pltf.'s Depo. at 72-73).

In Count III of her Complaint, Plaintiff alleges that Defendants failed to comply with Missouri's Service Letter Statute, Mo. Rev. Stat. § 290.140 (Compl. at ¶¶ 40-44).

After requesting a service letter on June 11, 2007, Michael Paull, counsel for Defendants, forwarded a service letter signed by Paull and dated June 21, 2007. The service letter provided to Plaintiff stated as follows:

> Pursuant to 290.140 R.S.Mo, and your request for this service letter, please be advised that Lorna Sowers was employed as an Advertising Manager by the Rolla Daily News, a division of GateHouse Media Missouri Holdings, Inc., and its predecessor newspapers, between January 11, 1989 and May 10, 2007. As Advertising Manager, Ms. Sowers was responsible for managing her staff of

advertising sales people and graphic artists. She also was responsible for selling advertising space in the newspaper to a book of business she controlled as well as new and potential customers. In most respects, Ms. Sowers was responsible for managing and increasing the advertising revenue for the newspaper. Ms. Sowers was discharged on May 10, 2004[*sic*], after the advertising sales figures were and had been dramatically lower than were acceptable. In addition, in the course of the Company's investigation as to the cause of this downturn in advertising business, the Company learned that a major part of the problem was significant anitpathy towards Ms. Sowers from the advertising public and her co-workers.

(Pltf.'s Resp. Document 29-28). Plaintiff testified that the letter was factually correct in that the letter properly sets forth her position, dates of employment, and responsibilities except for the typographical error indicating that Plaintiff was discharged on May 10, 2004, rather than her actual separation date of May 10, 2007. (Pltf.'s Depo. at 143-44). Although Plaintiff testified that she does not agree with the accuracy of the stated reasons for her termination, lower advertising revenues and antipathy towards Plaintiff from advertisers and coworkers, Plaintiff testified that she has "no way of knowing what they think." (Id. at 144). Plaintiff did not show the service letter to any potential employers nor did any potential employers ask for a copy of the service letter. (Id. at 144-45). Likewise, Plaintiff admitted that even if the service letter had been signed by Molenda, she would not have shown the letter to potential employers. (Id. at 145). Indeed, Plaintiff testified that she did not believe she had been denied any job or job offer because of the service letter or because it was not signed by Molenda. (Id.). Plaintiff contends that she was damaged by the verbiage in the letter, but she has not designated a medical expert or seen a medical care provider for any alleged emotional distress. ( Id. at 142, 145). Plaintiff testified that she was not aware of Defendants ever sending out service letters on behalf of other employees. (Id. at 143). Although Plaintiff testified that she has "no idea what the intent is" with respect to the issuance of the service letter, Plaintiff did not cite to any evidence supporting her belief the service letter was written with intent to harm her. (Id. at 145).

**Discussion**

**A.  ADEA Claim**

Defendants assert that summary judgment against Plaintiff is proper because Defendants possessed legitimate, non-discriminatory reasons for terminating Plaintiff's employment in the course of company restructuring and position elimination, Plaintiff is unable to establish that but for her age, she would not have been terminated.  In response, Plaintiff contends that evidence exists enabling her to make the requisite showing that but for age, she would not have been terminated in the restructuring and position elimination.

A plaintiff in a Title VII or ADEA discrimination case can proceed in one of two ways. Stacks v. S.W. Bell Yellow Pages, 996 F.2d 200 (8th Cir. 1993); Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994).  When a plaintiff produces direct evidence, such as statements by decision-makers, clearly showing that race, sex, or age was a motivating factor in the employment decision, or at least significant circumstantial evidence showing a specific link between the discriminatory animus and the challenged employment decision, the burden-shifting standards established by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), apply.  In the absence of such evidence, the guidelines set forth in Gross v. FBL Fin. Servs., Inc., 129 S.Ct. 2343, 2351 (2009), are applicable.  Inasmuch as there is no direct evidence or specific circumstantial evidence of discrimination, the Court will analyze Plaintiff's discrimination claims under the evidentiary framework of Gross.

The Supreme Court in Gross established that, "the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action."  Gross, 129 S.Ct. at 2351.  Specifically, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for'

cause of the challenged employer decision." Id. The Supreme Court further instructed that there is no "heightened evidentiary requirement" for plaintiffs to satisfy their burden of persuasion through "direct evidence" as opposed to "circumstantial evidence." Id. "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivation factor in that decision." Id. at 2352.

It is not clear whether the holding in Gross also applies to ADEA cases involving only indirect evidence of discrimination inasmuch as the Supreme Court noted that "the Court has not definitively decided whether the evidentiary framework of McDonnell Douglas Corp. v. Green, 411 U.S. 702, 93 S.Ct. 1817, 36 L.Ed. 668 (1973), utilized in Title VII cases is appropriate in the ADEA context." Gross, 129 S.Ct. at 2349 n.2. The "evidentiary framework of McDonnell Douglas" that the Supreme Court referred to is the standard that the Eighth Circuit has historically applied in ADEA cases involving only indirect evidence of discrimination. See King v. United States, 553 F.3d 1156, 1160 (8th Cir. 2009)(ADEA case; "where the plaintiff presents indirect evidence of discrimination, the court analyzes her claim under the burden-shifting framework set forth in McDonnell Douglas); Loeb v. Best Buy Co., Inc., 537 F.3d 867, 872 (8th Cir. 2008) (ADEA case; "Where, as here, the plaintiff presents only circumstantial evidence of discrimination, we apply the familiar burden-shifting analysis of McDonnell Douglas). Based on the Supreme Court's statement about McDonnell Douglas, the Eighth Circuit Court of Appeals has continued to apply the McDonnell Douglas burden-shifting approach to ADEA cases involving only indirect evidence. Id. Accordingly, because the Supreme Court precedent is unclear as to whether the McDonnell Douglas approach is applicable to ADEA indirect evidence cases, the undersigned believes that this Court is bound to follow Eighth Circuit

precedent, which follows <u>McDonnell Douglas</u> in ADEA indirect evidence cases.

Here, the record on the motion for summary judgment is fully developed and so the Court may turn to the question of whether Plaintiff has presented sufficient evidence to raise a genuine issue for trial on the ultimate question of age discrimination. <u>See</u> <u>Baker v. Silver Oak Senior Living Mang't Co.</u>, 581 F.3d 684, 688 (8th Cir. 2009).

The Court concludes that Plaintiff has presented a submissible case of age discrimination for determination by a jury. A factual dispute exists as to whether Defendants terminated Plaintiff in restructuring and position elimination due to her age. <u>See</u> <u>Hossaini v. Western Mo. Med. Ctr.</u>, 97 F.3d 1085, 1088 (8th Cir. 1996) (to survive summary judgment, plaintiff is required only to adduce enough admissible evidence to raise genuine doubt as to legitimacy of defendant's motive, even if evidence does not directly contradict or disprove articulated reasons for adverse employment action). Resolution of this issue will depend upon credibility determinations that cannot be made by the Court at this stage of the proceedings. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). <u>Yates v. Rexton, Inc.</u>, 267 F.3d 793, 800 (8th Cir. 2001) ( "In determining whether a plaintiff has met its burden with respect to pretext in a summary judgment motion, a district court is prohibited from making a credibility judgment or a factual finding from conflicting evidence."). Accordingly, Defendants' Motion for Partial Summary Judgment. (Docket No. 24) directed to Count I should be denied.

## B. <u>Missouri Human Right Act Claim</u>

Defendants assert that summary judgment against Plaintiff is proper because Defendants

possessed legitimate, non-discriminatory reasons for terminating Plaintiff's employment in the course of company restructuring and position elimination, Plaintiff is unable to identify any evidence to demonstrate either that Defendants' reasons were in any way pretextual or that her age was a contributing factor in her termination.

Like the ADEA, the Missouri Human Rights Act ("MHRA") prohibits an employer from discriminating against an employee because of the employee's age. Mo. Rev. Stat. § 213.055(1)(a). The standard for establishing an age claim under the MHRA is less demanding than under the ADEA. Daugherty v. City of Maryland Heights, 231 S.W.3d 814 (Mo. banc 2007). Under the MHRA, in order to show a violation and survive a motion for summary judgment, a plaintiff must establish that "age was a 'contributing factor'" to the adverse employment action. Baker v. Silver Oak Senior Living Mgmt. Co., L.C., 2009 WL 2914159 at *5 (8th Cir. 2009). Thus, a plaintiff's age discrimination claim under the MHRA will survive summary judgment if there is a genuine issue of material fact as to whether his/her age was a contributing factor in the defendant's adverse employment action; and the Court "must determine whether the record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' in the case is real, not merely argumentative, imaginary, or frivolous." Daugherty, 231 S.W.3d at 820 (citing ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. 1993); see also EEOC v. Con-Way Freight, Inc., 2009 WL 1688230 at * 7 (E.D. Mo. 2009) (citing Daughery, supra).

For all of the foregoing reasons and because the Court concludes that there is a genuine issue as to whether age was the "but for" cause of Plaintiff's termination under the ADEA, it follows that there is a likewise a question for trial about whether age was a contributing factor. Accordingly, Defendants' Motion for Partial Summary Judgment (Docket No. 24) directed to Count II should be

denied.

### C.  **Improperly Named Corporate Entities and the Rolla Daily News**

Defendants contend that Plaintiff has improperly named GateHouse Media, Inc., GateHouse Media Missouri Holdings II, Inc. and the Rolla Daily News as Defendants and as such, summary judgment on all three claims is appropriate as to those Defendants.  In response, Plaintiff contends that inasmuch as GateHouse Media, Inc., GateHouse Media Missouri Holdings, Inc., and GateHouse Media Missouri Holdings II, Inc. have interrelated operations, common management, centralized control of labor relations, and/or common ownership, they are one in the same, a single employer. Inasmuch as Plaintiff's response is devoid of any argument or legal analysis in support of how either the Rolla Daily News and GateHouse Media Missouri Holdings II, Inc. are appropriate Defendants, the Court will only address the appropriateness of GateHouse Media Inc. being named as Defendant. Although Plaintiff titles the section of her Memorandum in Opposition, "Piercing the Corporate Veil," she fails to cite any legal authority in support of piercing the corporate veil.  Indeed, the only case cited by Plaintiff is an age discrimination case, <u>Brennan v. Ace Hardware Corporation</u>.[3]

Only an "employer" may be liable under the ADEA or MHRA.  <u>See</u> 29 U.S.C. § 623(a); Mo. Rev. Stat. § 213.055.1(1)(a).  There is a "strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary

---

[3]Plaintiff captioned the case citation as <u>Westphal v. Catch Ball Products Corporation</u>.  The <u>Westphal</u> case is a southern district of New York case wherein the court found that an integrated enterprise existed between defendant and two related companies so that a single employer existed, thereby meeting the jurisdiction requirements of Title VII and ADEA.  953 F.Supp. 475 (S.D.N.Y. 1997).  The court denied summary judgment finding there was evidence that three related small companies, only one of which was a named defendant, were all run by the same individual as well as evidence of common ownership and control and interrelationship of operations.  <u>Id.</u>

circumstances." Brown v. Fred's Inc., 494 F.3d 736, 739 (8th Cir. 2007) (quoting Frank v. U.S. West, Inc., 3 F.3d 1357, 1362 (10th Cir. 1993) (ADEA and Title VII case)). "A parent company may employ its subsidiary's employees if (a) the parent company so dominates the subsidiary's operations that the two are one entity and therefore one employer, or (b) the parent company is linked to the alleged discriminatory action because it controls 'individual employment decisions.'" Brown, 494 F.3d at 739 (quoting Leichihman v. Pickwick Int'l, 814 F.2d 1263, 1268 (8th Cir. 1987)). When determining whether a parent and a subsidiary constitute a single "employer," courts look for evidence of interrelated operations, centralized control of labor relations, common management, and common ownership or financial control. Frank, 3 F.3d at 1362; c.f. Baker v. Stuart Broadcasting Co., 560 F.2d 389, 391 (8th Cir. 1977) (applying the same four-part test to determine whether parent and subsidiary are single employer under Title VII). A plaintiff must show something more than an ordinary parent-subsidiary relationship exists in order for a court to conclude that a parent and a subsidiary constitute a single employer. See, e.g., Leichihman, 814 F.2d at 1268 (holding summary judgment proper for parent corporation where no evidence linked it to its subsidiary's individual employment decisions); Rogers v. Sugar Tree Prods., Inc., 7 F.3d 577, 583 (7th Cir. 1993) (noting in ADEA case that parent may be liable as an employer where it "exercises such extensive control over the subsidiary's operations and personnel decisions that, in effect, the two corporations are one").

As discussed, the uncontroverted evidence shows that the operations are not closely interrelated and no shared centralized control of labor relations. GateHouse Media, Inc. and its subsidiaries, including GateHouse Media Missouri Holdings, Inc., maintain their separate corporate structures. Each subsidiary corporation manages itself through local management and human

resources functions with all personnel decisions being made at the local level. Likewise, all labor relations are managed by local human resource managers and/or local publishers. Plaintiff's W-2s show she was employed by GateHouse Media Missouri Holdings, Inc. and Defendant GateHouse Media Missouri Holdings, Inc. provided Plaintiff's W-2 forms. Only GateHouse Media Missouri Holdings, Inc. is registered to do business in Missouri. While the benefits Plaintiff received were administered by GateHouse Media, Inc. and GateHouse Media, Inc. and GateHouse Media Missouri Holdings, Inc. share some of the same officers and board of directors, they do not have common day-to-day managers or centralized control of personnel or other daily business matters. Defendant GateHouse Media Missouri Holdings, Inc. has provided unrebutted evidence that its operations and those of GateHouse Media Inc. are not closely interrelated.

Accordingly, on the record before the Court, GateHouse Media, Inc. and GateHouse Media Missouri Holdings, Inc. are not a single employer within the meaning of the discrimination laws and therefore GateHouse Media Inc. is not Plaintiff's employer for the imposition of liability under the ADEA and the MHRA. Further, Plaintiff failed to establish how the Rolla Daily News and GateHouse Media Missouri Holdings II, Inc. are appropriate defendants. Defendants' Motion for Partial Summary Judgment should be granted and GateHouse Media Inc., the Rolla Daily News, and GateHouse Media Missouri Holdings II are entitled to summary judgment.

### D. Violation of the Service Letter Statute

In Count III of the Complaint, Plaintiff alleges that she submitted a timely and proper service letter request to Defendants as required under the Missouri Service Letter Statute, § 290.140, Mo. Rev. Stat., and Defendants failed to comply. Plaintiff contends that Defendants' failure to comply was intentional, willful, wanton, malicious and/or outrageous and she has suffered both nominal and

compensatory damages.

The record establishes that Plaintiff received a service letter dated June 21, 2007 from Defendants' attorneys. The letter reads as follows:

> Pursuant to 290.140 R.S.Mo, and your request for this service letter, please be advised that Lorna Sowers was employed as an Advertising Manager by the Rolla Daily News, a division of GateHouse Media Missouri Holdings, Inc., and its predecessor newspapers, between January 11, 1989 and May 10, 2007. As Advertising Manager, Ms. Sowers was responsible for managing her staff of advertising sales people and graphic artists. She also was responsible for selling advertising space in the newspaper to a book of business she controlled as well as to new and potential customers. In most respects, Ms. Sowers was responsible for managing and increasing the advertising revenue for the newspaper. Ms. Sowers was discharged on May 10, 2004[*sic*], after the advertising sales figures were and had been dramatically lower than were acceptable. In addition, in the course of the Company's investigation as to the cause of this downturn in advertising business, the Company learned that a major part of the problem was significant anitpathy towards Ms. Sowers from the advertising public and her co-workers.

(Pltf.'s Document 29-28). Defendants never provided Plaintiff a service letter signed by any superintendent or manager of Defendants.

Plaintiff alleges that Defendants violated the Missouri service letter statute, Mo.Rev.Stat. § 290.140 by failing to issue a service letter after she properly requested such letter. The service letter statute requires that a corporate employer, upon request from an ex-employee, provide a letter "setting forth the nature and character of service rendered by such employee to such corporation and the duration thereof, and truly stating for what cause, if any, such employee was discharged or voluntarily quit such service." Mo.Rev.Stat. § 290.140(1). Furthermore, "any corporation which violates the provisions of subsection 1 of this section shall be liable for compensatory but not punitive damages but in the event that the evidence establishes that the employer did not issue the requested letter, said employer may be liable for nominal and punitive damages; but no award of punitive

damages under this section shall be based upon the content of any such letter." Mo. Rev. Stat. § 290.140(2).

"An employee who is entitled to a service letter, 'has a cause of action if the corporation fails to issue the letter or issues a letter not conforming to all the statutory requirements.'" Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1132 (8th Cir. 2001). "The failure to give a proper service letter is an invasion of the employee's legal rights, and an employee is entitled to a judgment for nominal damages without proof of any actual damages. Id.

"[A]n employer's mere failure to respond to a service letter request by itself, is insufficient grounds to award punitive damages." Callantine, 271 F.3d at 1132. A plaintiff must also show malice or that Defendant did a wrongful act intentionally without cause or excuse. Id.

To prove actual damages resulted from the service letter, a plaintiff must show: (1) she was refused employment or was hindered in obtaining employment, (2) that the refusal or hindrance was caused by the absence or inadequacy of the service letter, (3) that the position plaintiff had difficulty obtaining was actually open, and (4) the salary rate of the position. Ruzicka v. Hart Printing Co., 21 S.W.3d 67, 75 (Mo. Ct. App. 2000). "In other words, [Plaintiff] must show a potential employer held the service letter against him." King v. Professional Care Center, Inc., 735 S.W.2d 168, 169 (Mo. Ct. App. 1987). If a service letter does not hinder the former employee from obtaining employment, the plaintiff has not sustained actual damages from the service letter. Ruzicka, 21 S.W.3d at 75.

Plaintiff does not dispute the timeliness of Defendants' response to her service letter request or that the letter set forth her position, dates of employment[4] and responsibilities. Although Plaintiff

---

[4]Plaintiff is correct that in the letter, the second time her termination date is cited the incorrect year appears, 2004 versus 2007. (Pltf.'s Document 29-28).

disputes the accuracy of Defendants' reasons for her termination, lower advertising sales figures and significant antipathy towards Plaintiff, Plaintiff alleges a violation based on the service letter being written by an attorney, not a manager of the company. Although Plaintiff indicates that she "had no idea what GateHouse's intent was" in writing the letter, Plaintiff has not submitted any evidence showing Defendants possessed the requisite intent to harm her or that the letter was incorrectly drafted either intentionally or with a deliberate mind designed to injure her. The record is devoid of any evidence showing legal or actual malice by Defendants in the issuance of the service letter. The Court finds no evidence submitted by Plaintiff to support a finding that Defendant acted with malice or failed to respond intentionally or without just cause or excuse. Thus, Plaintiff has failed to present any evidence to support a claim for compensatory or punitive damages on her technical service letter claim.

Assuming arguendo a technical violation, Defendants assert that at most Plaintiff is entitled to nominal damages because Plaintiff has not provided any information from which a claim for actual or punitive damages could be derived. Plaintiff has failed to present any evidence to support a claim for actual or punitive damages. Accordingly, the Court will grant summary judgment in favor of Defendants on Plaintiff's claim for actual, compensatory, or puntive damages.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Partial Summary Judgment (Docket No. 24) is Denied in part and Granted in part as follows.

**IT IS FURTHER ORDERED** that Defendants' Motion to Disregard/Strike All Portions of Plaintiff's Sur-Reply Addressing Matters Beyond the Affidavit of Susan Labantschnig or Any Other Material Deemed "New," or, in the Alternative, for Leave to File Sur-Sur-Reply to All Remaining

Matters (Docket No. 36) is Granted to the extent that the Court will disregard any argument unrelated to either the Labantschnig affidavit or any other materials deemed "new" contained in Plaintiff's Sur-Reply.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment is GRANTED as directed to Plaintiff's claim for actual, compensatory, and punitive damages on her technical service letter claim.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment (Docket No. 24) directed to Counts I and II is DENIED.

**IT IS FURTHER ORDERED** that

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this   22nd   day of April, 2010.


           /s/Terry I. Adelman          
UNITED STATES MAGISTRATE JUDGE